**WINNING WAYS, INC., Plaintiff,**

v.

**HOLLOWAY SPORTSWEAR, INC. and Holloway Group, Inc., Defendants.**

No. 94–2493–JWL.

United States District Court,
D. Kansas.

Jan. 12, 1996.

---

James P. O'Hara, Shughart, Thomson & Kilroy, Overland Park, KS, Michael P. Allen, Shughart, Thomson & Kilroy, Kansas City, MO, Charles J. Hyland, Sprint Communications Company L.P., Law Department, Kansas City, MO, for plaintiff.

Edward M. Boyle, Payne & Jones, Chtd., Overland Park, KS, Lynda E. Roesch, Cincinnati, OH, for defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Winning Ways, Inc. (Winning Ways) and defendant Holloway[1] manufacture and sell clothing, including jackets. Winning Ways maintains that the overall look of what it calls its Clipper and Victory jackets are protectable trade dress. Winning Ways argues that Holloway's duplication of the Clipper and Victory infringes that trade dress in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1051 *et seq.* (1988).

Trial to the court began on December 5, 1995. Winning Ways called four of its employees to testify: Larry Graveel, Terry Glenn, Lee Ann Stevens and Kurt Kowalewski. Plaintiff also called Roy Leasure, president of Holloway Sportswear, Inc., and Dr. Carl Block, who conducted surveys at Winning Ways's request. Finally, Winning Ways submitted the deposition testimony of five additional witnesses: Jerry Weider, Gary Gray, and Wayne Kimmell, present or former Holloway employees; Ted Lienesch, a patent/trademark attorney; and David Jensen, a sales representative who formerly carried plaintiff's line.

After Winning Ways rested on December 8, 1995, Holloway moved under Federal Rule of Civil Procedure 52(c) for judgment as a matter of law. After weighing the evidence, the court concludes that the overall look of Winning Ways's Clipper and Victory jackets are not protectable trade dress.

### I. Legal Standard for Rule 52(c)

■ Rule 52(c) vests a judge with the discretion to enter judgment on any issue after hearing all of a party's evidence. The rule provides:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of

---

1. Defendants Holloway Sportswear, Inc. and Holloway Group, Inc. presented a joint defense. As did the parties during this litigation, the court will refer to defendants collectively as Holloway and use that term in the singular throughout this memorandum and order.

law against that party with respect to a claim ... that cannot under the controlling law be maintained ... without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law....

This rule does not require the court to consider the evidence in the light most favorable to the nonmoving party. *Roth v. American Hosp. Supply Corp.,* 965 F.2d 862, 865 (10th Cir.1992) (citing *Blankenship v. Herzfeld,* 661 F.2d 840, 845 (10th Cir.1981)).[2] Rather, the court weighs the evidence and assesses the credibility of witnesses to determine whether or not Winning Ways has demonstrated a factual and legal right to relief by a preponderance of the evidence. *Id.* (citing *Feldman v. Pioneer Petroleum, Inc.,* 813 F.2d 296, 299 & n. 4 (10th Cir.1987)). Wright and Miller, *supra,* § 2573.1.

II. *Findings of Fact and Conclusions of Law*

Consistent with the requirements of Rule 52(c), the court makes the following findings of fact and conclusions of law.

A. *Background*

Winning Ways is a Missouri corporation headquartered in Lenexa, Kansas. Since its founding in 1974, Winning Ways has designed, marketed and sold clothing apparel. Prior to 1985, plaintiff sold its products through department stores, discount stores and sporting goods stores. Prior to 1985, Winning Ways did not sell a significant amount of products to college bookstores, resorts or businesses.

In 1985, Winning Ways decided to increase its presence in the college bookstore market. Success in this effort enabled Winning Ways to sell its products to resorts. Clientele at these resorts includes business managers who purchased Winning Ways's products, liked them, and inquired about using Winning Ways products to promote their businesses.

Winning Ways presently sells substantially all of its products in what it calls the college bookstore, resort, and corporate identity markets. In 1994, for example, Winning Ways's sales occurred in the following manner: college bookstores, 30 percent; resorts, 35 percent; corporate identity accounts, 25 percent; and miscellaneous sales, 10 percent. Winning Ways moved away from mass merchandising and into these more specialized areas in order to benefit from higher profit margins and a brighter long term outlook.

Plaintiff does not employ its own sales force. Rather, approximately 117 independent sales representatives carry various Winning Ways apparel lines. None of Winning Ways's sales representatives sell Holloway products. The sales representatives are divided by market and by geographic region. The customers of these sales representatives are professional buyers for either college bookstores, resorts, or businesses. The sales representatives do not sell to the ultimate consumer, *i.e.* the person who wears the product.

Winning Ways sells its jackets under the name Gear for Sports, which has been trademarked, and, to a relatively minor extent, under the private labels of other entities. Even on jackets produced under private labels, the Gear for Sports name commonly appears somewhere on each jacket's label and/or accompanying hang tag.

As part of its Gear for Sports line, Winning Ways began developing the Victory and Clipper jackets in 1990. The Victory is a front zipped, hooded jacket with a nylon outer shell and an interior fleece lining that has the smooth side turned toward the wearer. The Clipper is a front zipped jacket with a poly/cotton outer shell, front and rear caping, two way side pockets and a standup, double collar. Winning Ways does not own a patent on either jacket.

Sales of the Clipper began in the fall of 1990. The following spring, plaintiff began selling the Victory. Both have been sold continuously since their introduction and are

---

**2.** *Roth* applies old Rule 41(b), which authorized dismissal at the close of a plaintiff's case. Case law interpreting old Rule 41(b) is applicable to

Rule 52(c). 9A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2573.1 (2d ed. 1995); *see Roth,* 965 F.2d at 865 n. 2.

Winning Ways's most successful products. In the bookstore market, over 60 percent of Winning Ways's customers have purchased the Victory. Fewer than that carry the Clipper. In the other two markets, the Clipper outsells the Victory. In the corporate identity market, for example, the Clipper is the number one product for Winning Ways.

The Victory is largely an original design. A previous fleece jacket sold by Winning Ways did provide the basic model but the previous model did not have a nylon outer shell, the addition of which created an essentially new jacket style. Winning Ways designed the Victory to replace the previous fleece jacket because the older model had become too expensive to sell.

Unlike the Victory, the Clipper was inspired by a preexisting jacket design. While on a trip to Korea in 1990, three of Winning Ways's employees, Larry Graveel, Lee Ann Stevens, and Terry Glenn, saw a London Fog labeled jacket (London Fog). The London Fog has front and rear caping, two way side pockets, and a standup, double collar. The London Fog was taken back to Lenexa and provided the basis for the Clipper design.

The Clipper differs from the London Fog in some respects. For example the double collar on the Clipper is slightly taller than the London Fog jacket's double collar. The elasticized waistband on the Clipper is slightly wider than that on the London Fog. The Clipper has air vents underneath its rear caping; the London Fog does not. The drawstrings on the Clipper are longer than the drawstrings on the London Fog. The Clipper uses different buttons on its cuffs. Nevertheless, the Clipper and London Fog jackets create the same general overall look. Both are stylish, classic looking jackets with stand up, double collars, speckled drawstrings and front and rear caping.

Holloway Sportswear, Inc. and Holloway Group, Inc. are sister corporations. Holloway Sportswear manufactures products that Holloway Group then sells in four markets, which Holloway labels as (1) sporting goods dealers, (2) ASI, (3) outdoor, and (4) gifts and recreation. Holloway makes approximately 60–65 percent of its sales in the sporting goods dealers market, 35 percent in the ASI market and less than 5 percent in each of the company's remaining two markets.

The markets of Winning Ways and Holloway overlap in certain areas. Holloway includes college bookstores within its sporting goods dealers market, corporate clients within its ASI market and resorts within its gifts and recreation market. Winning Ways includes certain sporting goods dealers in both its resort market and college bookstore market. The relative strengths of the two companies differ widely in the various markets but both compete and both would like to increase market share. Some retailers of the companies' products also compete. For example, sporting goods stores often compete with college bookstores for the same consumer. Thus, in effect, Winning Ways's relative strength in the college bookstore market competes with Holloway's relative strength in the sporting goods dealers market.

Like Winning Ways, Holloway sells its products primarily through independent sales representatives. Holloway does have two "in-house" sales representatives but the bulk of its sales are generated by the over 100 independent sales representatives carrying Holloway lines. Holloway's independent sales representatives do not carry Winning Ways's products.

In 1993 or 1994, Holloway's sales representatives began telling Holloway that Winning Ways's Victory and Clipper jackets were popular and that Holloway needed jackets of similar style to compete. The sales representatives also asked for jackets in styles similar to certain Munsingwear, Wall Street Journal, London Fog and Orvis brand jackets. Each of these jackets is very similar in style to the style of the Victory or Clipper jacket.

In response to these requests, Holloway copied the style of the Victory and Clipper jackets by breaking down these jackets and copying their features. Holloway called its Victory style jacket Competitor and its Clipper style jacket Challenger. Holloway began selling these jackets in 1994, which prompted this suit.

### B. *Framework for Analysis*

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[3] creates a civil cause of action for a party injured by a "false designation of origin" of a competitor's product, including false designation by a product's trade dress. "Trade dress features are those comprising a product's look or image." *Vornado Air Circulation Systems, Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996). Although traditionally trade dress consisted of a product's packaging, trade dress has also come to include the overall appearance of the product itself. *Id.* Winning Ways alleges that the combination of features in the Clipper and Victory jackets create an overall appearance in each jacket that is protectable trade dress.

Although the overall look of a product may operate as trade dress, product configuration trade dress cases raise special concerns. The features of the product are part of the product itself and may be valued as such by the consumer rather than as a source identifier. Thus, in product configuration cases, a court must "distinguish between goodwill toward the producer—all that trade dress law protects—and goodwill toward the article—'the attractive features, of whatever nature, that the product holds for consumers'—which is freely appropriable by second comers." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657 (7th Cir. 1995) (citing *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 215 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995)). Exploiting the goodwill of the article "is robust competition; only deceiving consumers, or exploiting the good will of another producer, is unfair competition." *Versa Prods. Co.*, 50 F.3d at 215. It is with these concerns in mind that the court turns to whether plaintiff has made its case.

To prove trade dress infringement, Winning Ways must make two showings. First, Winning Ways must establish that the combination of features comprising the Clipper or Victory jackets has created an overall look that either (a) is inherently distinctive or (b) has acquired distinctiveness through secondary meaning. *Vornado*, 58 F.3d at 1502. (citing *Qualitex Co. v. Jacobson Prods. Co.*, —— U.S. ——, ——, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–73, 112 S.Ct. 2753, 2757–60, 120 L.Ed.2d 615 (1992); *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938)). Second, Winning Ways must show that potential customers are likely to be confused by Holloway's trade dress. *Id.* at 1503. Each of these inquiries is a question of fact. *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 784 (8th Cir.1995); *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, (1st Cir.1993) (inherent distinction); *Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir.1988) (secondary meaning); *J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir.1985) (secondary meaning); *Universal Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1530 n. 2 (10th Cir.) (likelihood of confusion), *cert. denied*, —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Coherent, Inc. v. Coherent Technologies, Inc.*, 935 F.2d 1122, 1125 (10th Cir.1991) (likelihood of confusion). When evaluating product configuration trade dress, a court cannot look at individual features in isolation but rather must consider "the whole collection of features, taken together." *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir.) (citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir.1987); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 n. 25 (11th Cir.1986); *SK&F Co. v. Premo Pharmaceuti-*

---

**3.** In relevant part, section 43(a) provides:
> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*cal Laboratories, Inc.,* 481 F.Supp. 1184, 1187 (D.N.J.1979)).

■ Whether or not secondary meaning and likelihood of confusion exist is determined in the context of the relevant markets, which Winning Ways asserts are the college bookstore, resort and corporate markets. Winning Ways claims that the college bookstore and resort markets contain two classes of purchasers, professional buyers and consumers.

■ In the corporate market, not all consumers who receive a jacket purchase it. Some corporate consumers receive a jacket as part of the business's incentive program. Other corporate consumers purchase from a fulfillment house. A fulfillment house contracts with the business to provide a service where an employee can call the fulfillment house and order a jacket or a hundred jackets. Winning Ways has a fulfillment house as a subsidiary. Aside from evidence explaining how a fulfillment house operates, plaintiff has introduced no evidence concerning the consumer level of the corporate market. As a result, the court concludes that the corporate consumer market is not a relevant market for purposes of this action.

### C. Inherent Distinctiveness

■ In the Tenth Circuit, a product's configuration is inherently distinctive if the configuration's "intrinsic nature is such as to 'almost automatically tell a customer that [it] refer[s] to a brand.'" *Vornado Air Circulation Systems,* 58 F.3d at 1502 (citing *Qualitex Co.,* —— U.S. ——, 115 S.Ct. at 1303). When making this determination in trademark cases, the Tenth Circuit has relied on the categorical approach first stated in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976). *See, e.g., Beer Nuts, Inc. v. Clover Foods Co. (Beer Nuts I),*

711 F.2d 934, 939 & n. 5 (10th Cir.1983). Under that approach, a trademark characterized as "fanciful," "arbitrary," or "suggestive" almost automatically refers to a brand. *Qualitex Co.,* —— U.S. at ——, 115 S.Ct. at 1303 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9–10 (2d Cir.1976)). A trademark categorized as "generic" or "descriptive" does not.[4] *See id.; Abercrombie & Fitch Co.,* 537 F.2d at 9–10.

Some courts, however, have criticized the application of the *Abercrombie* classifications to product configuration trade dress. They state that such classifications make little sense when the trade dress at issue consists of the product's own features rather than the product's packaging. *See, e.g., Knitwaves, Inc. v. Lollytogs, Ltd.,* 71 F.3d 996, 1007 (2d Cir.1995); *Duraco Prods., Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431 (3d. Cir. 1994). As a result, these courts ask whether the product's configuration is "likely to serve primarily as a designator of origin of the product." *Knitwaves, Inc.,* 71 F.3d at 1008.

■ Such a standard closely resembles that stated in *Vornado.*[5] In support of the standard it announces, however, the *Vornado* court cites *Qualitex,* in which the Supreme Court applied the test from *Abercrombie & Fitch.* This court need not decide whether *Vornado* impliedly adopts the *Abercrombie & Fitch* approach for product configuration trade dress or whether *Vornado* announces a new, more simple standard. Under either approach, the overall look of neither the Clipper nor the Victory is inherently distinctive.

Winning Ways claims that numerous features on both the Clipper and Victory jackets are inherently distinctive. The features to which Winning Ways points are drawn from the front of each jacket, the rear, the inside and the outside. The features are large, *e.g.* the rear cape on the Clipper, and small, *e.g.*

---

**4.** The Tenth Circuit has defined each of these terms. Generic refers to "a particular genus or class of which an individual article or service is but a member." *Beer Nuts I,* 711 F.2d at 939 (citation omitted). A descriptive trademark "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 939 n. 5 (citing *Abercrombie & Fitch Co.,* 537 F.2d at 11). A suggestive trademark requires "imagination, thought and perception to reach a

conclusion as to the nature of goods." *Id.* (citing *Abercrombie & Fitch Co.,* 537 F.2d at 11). A fanciful or arbitrary trademark "bear[s] no relationship to the product or service with which [it is] associated." *Id.* (citation omitted).

**5.** Such language also closely resembles the standard announced in *Vornado* for secondary meaning.

the "# 5" size zipper on both jackets, readily visible, *e.g.* the jackets' color combination, and less so, *e.g.* the size, shape, color, number and placement of the two spare buttons sewn to the inside of the Clipper. It is the overall look created by the combination of these features [6] that Winning Ways contends is inherently distinctive.[7]

Under the *Abercrombie & Fitch* typology, the trade dress created by the overall look of plaintiff's jackets is descriptive because the overall look does nothing more than convey an immediate idea of the ingredients, qualities or characteristics of the goods. No imagination, thought or perception is necessary to reach a conclusion as to the nature of the goods. The overall look bears a fundamental relationship to the jackets. Descriptive trade dress is not inherently distinctive. Application of the Tenth Circuit's elegantly simple statement in *Vornado* yields the same result. The overall look of neither jacket "almost automatically tell[s] a customer that [it] refer[s] to a brand." The overall look of each jacket merely tells a customer this a nice jacket. Therefore, by either standard, neither jacket is inherently distinctive.

### D. *Secondary Meaning*

Even if trade dress is not inherently distinctive, it may nevertheless acquire distinction by attaining secondary meaning. Trade dress has secondary meaning if "its primary significance in the minds of potential consumers [8] is no longer as an indicator of something about the product itself but as an indicator of its source or brand." *Vornado,* 58 F.3d at 1502. The source or brand need not be identified; secondary meaning merely requires a proven association between the trade dress and a single source, even an anonymous source. *See* 15 U.S.C. § 1127 (1988) (defining trademark as a device that "indicate[s] the source of the goods, even if that source is unknown"); *see also Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1203 n. 11 (Fed.Cir.1994) (applying the anonymous source rule in a trade dress infringement action), *cert. denied,* — U.S. ——, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995).

Although the Tenth Circuit has not yet addressed the point, numerous other courts have considered the following factors helpful when determining whether trade dress has acquired secondary meaning: (a) direct consumer testimony, (b) surveys, (c) amount and manner of advertising, (d) unsolicited media coverage, (e) exclusivity, length and manner of use, (f) amount of sales and number of customers, and (g) proof of intentional copying. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1041 (2d Cir.1992); *see Dun & Bradstreet Corp. v. National Seminars,* No. 89–2338–O, 1990 WL 182338, *3 (D.Kan.1990); J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15.10[3] (3d ed. 1995). The court evaluates these factors, as well as any other relevant evidence, with an eye to the ultimate inquiry—what is the primary significance of the overall appearance of the

---

6. The evidence at trial indicated that the look Winning Ways claims as trade dress in its everyday dealings with other companies is more general than the exact features that comprise the Victory and Clipper. Numerous jackets from various manufacturers were introduced during the course of the trial. Winning Ways claims that some of the jackets infringe even though they are not exact copies of Winning Ways's products. For example, one Clipper-style coat with a "1721 Sportclub" label has a solid drawstring, an interior lining that matches the color of the exterior, and different shaped pockets. Each of these characteristics differs from the corresponding feature on the Clipper, yet Winning Ways claims in this case that the Clipper's speckled drawstring, contrasting lining, and pocket shapes all contribute to Clipper's overall look.

7. Winning Ways claims that Holloway itself recognizes that the Victory and Clipper are inherently distinctive. In support of this contention, Winning Ways introduced a telephone conversation between Mr. Weider, a Holloway employee, and Mr. Lienesch, a patent attorney. In that conversation, Mr. Weider described the jackets as having some unique design configurations. The context of this statement makes it clear, however, that Mr. Weider was referring to certain specific features rather than the overall look of the jacket.

8. As one of its arguments, plaintiff has alleged that secondary meaning exists because Winning Ways intended the overall look of the combination of features to be a source identifier. As the definition of secondary meaning makes clear, what Winning Ways intended is irrelevant; what counts is the purchaser's perceptions.

Clipper and Victory in the minds of potential consumers.

## 1. *Surveys*

No direct consumer testimony was introduced in this case. Winning Ways did commission surveys of professional buyers and consumers in college bookstores and resorts and of professional buyers for businesses. At trial, Holloway objected to the admissibility of the surveys, the parties argued the question and the court took the matter under advisement. After careful consideration of the parties' arguments, the relevant legal precedent and the surveys themselves, the court concludes that the survey evidence of pro shop consumers is admissible for the purpose of determining whether secondary meaning exists. The methodological defects in the other surveys, however, are so significant that they render the remaining survey evidence inadmissible for the purposes for which it was offered.

■ The court recognizes that methodological deficiencies generally relate to the weight given to a survey's conclusions rather than to its admissibility, *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir.1987), but if those deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir.1993); *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir.1992); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 660 n. 4 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Bank of Utah v. Commercial Security Bank*, 369 F.2d 19, 27–28 (10th Cir.1966), *cert. denied*, 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456 (1967); *Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 73–74 (E.D.N.Y. 1993); *Boehringer Ingelheim GmbH v. Pharmadyne Laboratories*, 532 F.Supp. 1040, 1057–58 (D.N.J.1980). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, –––– ––––, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993), the Supreme Court underscored a trial judge's responsibility to examine expert testimony critically to ensure that it is both reliable and relevant before admitting it. This responsibility extends to the survey evidence at issue here.

Dr. Carl Block designed and conducted the surveys commissioned by Winning Ways. He met with plaintiff's lawyers, saw the Victory and Clipper jackets, and learned the channels of distribution and the markets into which those jackets are sold. With this information, he determined that two categories of people purchase the Victory and Clipper jackets, consumers and professional buyers. He then broke these two categories into five markets: consumers in college bookstores, consumers in country club or resort pro shops, professional buyers for college bookstores, professional buyers for pro shops, and professional buyers for businesses. Having determined what he felt to be the relevant markets, Dr. Block attempted to design surveys that would gauge whether the Victory and/or Clipper jackets had obtained secondary meaning in any of those markets and whether Holloway's Competitor and Challenger jackets were likely to cause confusion in those markets.

In the consumer surveys, Dr. Block surveyed consumers at two St. Louis, Missouri college bookstores, Washington University and University of Missouri at St. Louis; the University of Arizona college bookstore in Tucson, Arizona; and four country club/resort pro shops—two in both Phoenix and St. Louis. Dr. Block surveyed a total of 474 consumers, 316 in the college bookstore market and 158 in the country club/resort market.

At the interview site, each surveyor had one of the following combinations of two jackets: Victory and Competitor; Victory and Ivy Club; Clipper and Challenger; or Clipper and Ivy Club. Dr. Block marked Victory as "A", Competitor as "B", Clipper as "C", Challenger as "D", and Ivy Club as "X" or "Y" depending on whether it was paired with the Victory or Clipper respectively. Dr. Block displayed the jackets as he received them. For example, of the jackets used in the survey and introduced at trial, hang tags were attached to the Clipper and Ivy Club jackets but to no other. Each jacket had a Gear for Sports, Holloway or

Ivy Club label. Regardless of what combination of two jackets each surveyor had, these jackets were hung on a rack placed such that the surveyor was between the jackets and the consumer being interviewed.

The purpose of the Ivy Club jacket, which looks nothing like either the Clipper or Victory style jackets in coloring, silhouette or styling, is to test for "noise", *i.e.* influences other than the stimulus being measured by the survey that cause the same response that the stimulus being measured causes. For example, a consumer could state that the Ivy Club jacket and the Victory jacket are made by the same company because he or she believes all jackets are made by the same company. Such a response would be considered noise in surveys such as these which attempt to measure the likelihood of confusion by compiling the number of people who state that the Holloway and Winning Ways jackets are made by the same company because the overall look of the jackets is the same.

Surveyors were instructed to approach the first adult entering the interviewing area, introduce himself or herself and ask if the person would be willing to answer a few questions. If the consumer was cooperative, the surveyor asked the screening question "Have you purchased or shopped for any clothing items in a college bookstore [or pro shop] during the last 12 months." If the consumer answered no, the interview ended. Otherwise, the surveyor began questioning about the jackets on the rack.

The surveyor took the first jacket, marked either A or C, off the rack, handed it to the consumer and stated, "Please look at this as you would in a college bookstore [or pro shop], then return it to me." After the consumer returned the first jacket, the surveyor placed it on the rack, removed the second jacket, marked B, X, D or Y, handed it to the consumer and repeated the question. Once the consumer returned each jacket, he or she was not permitted to handle it again. After the second jacket was returned to the rack, the surveyor held up the first jacket alone and asked the consumer questions 1a and 1b: "Who do you believe puts out this jacket" and "What makes you say that." Once the consumer's answers were recorded verbatim, the surveyor replaced the first jacket back on the rack, held up the second jacket and asked the same questions, which were termed by the surveyor questions 2a and 2b.

If in response to questions 1a and 2a, the consumer stated that the same source put out both jackets, the surveyor concluded the interview. If not, the surveyor asked question 3: "Do you believe that the two jackets that you just looked at are (A) put out by the same company; (B) put out by related companies; (C) put out by unrelated companies." The surveyor circled the consumer's response or marked "Don't know" if the consumer so responded. If the consumer stated that the two jackets were put out by the same company or by related companies, the surveyor asked question 4: "What makes you say that."

After detailing the methodology of the consumer surveys, Dr. Block testified about the surveys' results. He testified only about the responses given to questions 1a and 3. Implicit in the questioning of Dr. Block is that question 1a gauges secondary meaning and question 3 measures likelihood of confusion.[9] Of the 157 college bookstore consumers who saw the Victory, 68 (or 43 percent) identified the source of the jacket as Gear, Maybe Gear, or Gear for Sports. One hundred fifty-nine college bookstore consumers saw the Clipper and 74 (or 47 percent) gave comparable responses. In pro shops, 82 consumers saw the Victory and 76 saw the Clipper. Seventeen (or 21 percent) of the Victory observers identified the jacket's source as Gear, Maybe Gear or Gear for Sports. Thirty six (or 47 percent) of the consumers seeing the Clipper responded similarly. Following this testimony, Dr. Block stated his opinion that secondary meaning existed at the consumer level in both markets.

Multiple flaws mar the value of the consumer survey evidence as a measure of secondary meaning. First, the surveyors always handed the consumer the Winning Ways jacket first. This creates an order effect because a consumer might not look at

---

**9.** For a discussion of the responses to question 3, see section E, *infra.*

the second jacket as closely as he or she did the first, particularly when the second jacket is identical to the first. For example, a consumer who customarily examines a label when making a purchase might observe that the second jacket handed to him or her by the surveyor looks like the first, assume that the second jacket comes from the same seller, and not examine the second jacket's label as he or she normally would. According to the Reference Manual on Scientific Evidence ("Manual") 249 (1994), although order effects "are typically small, no general formula is available that can adjust values to correct for" them. The Manual continues, "to control for order effects, the order of the questions and the order of the response choices should be rotated." *Id.* By always handing the Winning Ways jacket to the consumer first, Dr. Block created an order effect of undeterminable magnitude.

■ Second, Dr. Block's definition of the consumer market is fatally underinclusive. The evidence introduced at trial established that college bookstores and sporting goods stores compete for the same consumer. Mr. Leasure so testified and an edition of Gear for Sports Reports, a newsletter issued by plaintiff, states "[w]hether the goods are sold across the street or at a mall across town, we are all competing for the same consumer." While approximately 3200 college bookstores exist, over 6000 sporting goods stores operate in the United States. Dr. Block's failure to survey consumers at sporting goods stores extinguishes the probative value of the survey in gauging the perceptions of consumers in this market. A survey should sample "the full range of potential [consumers] for whom plaintiff and defendants" compete. *American Home Prods. Corp. v. Barr Lab.*, 656 F.Supp. 1058 (D.N.J.), *aff'd*, 834 F.2d 368 (3d Cir.1987).

■ Winning Ways's relative strength in college bookstores versus sporting goods stores suggests that the survey's results overstate the association of the overall look of the jackets with Winning Ways, but it is impossible to be certain. As stated in the Manual, "[i]f the sample is drawn from an underinclusive universe, there is no way to know how the unrepresented members would

have responded." Manual, *supra*, at 237. "A survey is inadmissible when the sample is clearly not representative of the universe it is intended to reflect." *Bank of Utah*, 369 F.2d at 27. Dr. Block's survey of college bookstore consumers is clearly not representative of the college bookstore/sporting goods store consumer market. Therefore, the consumer survey evidence is inadmissible for purposes of determining secondary meaning and defendants' objection is, to that extent, sustained.

■ Holloway contends that pro shops at resorts also compete for this same customer. The granting of Holloway's motion prevented the introduction of any evidence to support this contention. Furthermore, the court infers that resort customers may purchase a jacket at a resort substantially because of the resort logo on the jacket. It is unlikely that such a logoed jacket would be available anywhere besides the resort. Accordingly, the court concludes that the pro shop consumer survey is not underinclusive. The court further finds that the order effect described above does not suffice to render the pro shop consumer survey evidence inadmissible, but rather goes to the weight accorded the survey evidence. The pro shop survey evidence is therefore admissible for purposes of determining secondary meaning.

■ Although the court's granting the objection of defendants to the bulk of the survey evidence substantially diminishes plaintiff's case, the court also concludes that even if it had admitted all of the survey evidence it would find none of it persuasive on this point. No consumer survey establishes that secondary meaning exists in any of the consumer markets, even as Dr. Block defines them. In the college bookstore market, of the 68 consumers who identified the source of the Victory as Gear, Maybe Gear, or Gear for Sports, only 4 gave familiarity with the product as the reason, while 59 cited the jacket's label. Thus, only 2.5 percent, 4 of 157, of the college bookstore consumers who viewed the Victory associated it with Winning Ways because of familiarity. The court recognizes that the consumers citing

the label of the jacket could have had additional reasons for their answer but, if they did, plaintiff has failed to prove it.

Turning to the Clipper, of the 74 college bookstore consumers who identified the Clipper's source as Gear, Maybe Gear, or Gear for Sports, 71 cited the label as the reason for their answer and 3 relied on familiarity. Thus, of the 159 college bookstore consumers viewing the Clipper, only 2 percent, 3 of 159, associated the Clipper with plaintiff.

In the pro shop consumer market, the results are even more closely tied to the jackets' labels. None of the 53 pro shop consumers who identified the Victory or the Clipper as a Gear, Maybe Gear or Gear for Sports product cited familiarity with the overall look of the jacket as the basis for their conclusion.

■■■ Secondary meaning requires proof that a significant or substantial part of the buying class uses the trade dress to identify a single source. J. Thomas McCarthy, *supra*, § 32.54[2][a]. No set percentage defines significant or substantial. Nevertheless, the court finds that, under the circumstances of this case, the college bookstore consumer survey illustrates that a *de minimis*, rather than significant, portion of consumers associate the overall look of the Clipper and/or Victory jackets with Winning Ways. *See Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir.1992) (finding a recognition figure of 38 percent "marginal" evidence of secondary meaning, even in a "properly designed survey"); *Roselux Chem. Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 862 (C.C.P.A.1962) (holding that 10 percent association failed to establish secondary meaning); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F.Supp. 75, 81

(S.D.Fla.1981) (holding that 2.7% is *de minimis*), *aff'd*, 716 F.2d 854 (11th Cir.1983). In the resort market, the zero percent association shown by the pro shop consumer survey is, of course, a less than insignificant figure.

In summary, the consumer survey evidence offered by the plaintiff is inadmissible to determine the existence of secondary meaning in the college bookstore/sporting goods store consumer market because the survey is so severely underinclusive as to be unreliable for the proposition it is proffered to support. Even if the survey were admitted, it would not support the existence of secondary meaning. Of college bookstore consumers surveyed, only 2.5 percent of those shown the Victory and 2 percent of those shown the Clipper identified the source of the jackets as Gear, Maybe Gear, or Gear for Sports on the basis of familiarity. The pro shop consumer survey is admissible but also fails to establish secondary meaning. None of those surveyed identified the Clipper or Victory as a Gear, Maybe Gear, or Gear for Sports product on the basis of familiarity. Simply put, the consumer surveys do not establish secondary meaning in any consumer market.[10]

■■■ In his surveys of professional buyers, Dr. Block asked the same questions but used a different methodology. Far from mending the flaws that marred the consumer survey evidence, the very methodology of the professional buyer surveys renders the professional buyer survey evidence irrelevant.

Turning to the methodology, Winning Ways provided Dr. Block with a list of country club, resort, college bookstore and business organization buyers who purchased

---

10. The court's analysis of the consumer surveys, which focuses on the association between Gear, Maybe Gear or Gear for Sports and the overall look of the Clipper and Victory, reflects the approach taken by plaintiff when presenting its case. As noted above, however, secondary meaning does not require association with a specific source.

After examining the consumer surveys, the court concludes that, putting aside the admissibility of the college bookstore consumer survey, the consumer surveys fail to establish an association between the overall look of the Clipper and

Victory and any source. After Gear, the single largest response to question 1a is "Don't know." The source aside from Gear, Maybe Gear, or Gear for Sports that received the largest response was L.A. Gear. On the basis of familiarity, one pro shop consumer and one college bookstore consumer stated that L.A. Gear put out the jackets. No other identified source was cited on the basis of familiarity. The court therefore concludes that the consumer surveys, even where they are admissible, fail to establish secondary meaning as to any source.

from Winning Ways. Surveyors selected names at random from these lists and telephoned them. Once the buyer was reached, the surveyor introduced himself or herself and asked a screening question, "Are you the person responsible for buying the clothing items sold in your shop." If the buyer responded "yes" and agreed to participate in the study, the surveyor sent a package to the buyer via Federal Express. The buyer was instructed not to open the package until the surveyor called again at a prearranged time.

Inside each package were two envelopes marked as either "Envelope A", "Envelope B", "Envelope X", "Envelope C", "Envelope D", or "Envelope Y". Each envelope contained a picture of a person wearing jacket A, B, etc. The jackets and letters mirror those used in the consumer survey. The combination of envelopes that might appear in each packet also corresponds with the combination of jackets that each surveyor could have in the consumer survey.

The pictures in the envelopes show a man standing up, facing the camera wearing a zipped up jacket. Winning Ways provided the photographs of jackets A, B, C, and D. The same man, wearing the same clothes (aside from the jacket) in front of the same backdrop appears in each professionally done photo. Dr. Block took the photographs of the jacket marked X or Y. The slightly unfocused photographs are of a different man, in different clothes, standing in front of a different background, wearing a zipped up jacket.

At the prearranged time, the surveyor would call the buyer and ask that he or she open the first envelope marked A or C. The surveyor instructed the buyer to "[l]ook at the picture as you would if you were considering buying this item. After you have finished looking at it, put the picture back in the envelope marked [A or C]. Put this envelope aside." After hearing that the photo was back in the envelope, the surveyor asked questions 1a and 1b—the same questions asked in the consumer surveys. The surveyor then instructed the buyer to open the second envelope marked B, X, D, or Y and do likewise. Questions 2a and 2b followed. As with the consumer surveys, the

buyer's answers might trigger questions 3 and 4.

At trial, Dr. Block outlined his methodology and then testified about the results he recorded. Thirty-three college bookstore buyers saw the Victory; seven saw the Clipper. Of these, 31 identified the Victory as a Gear or Gear for Sports product; seven so recognized the Clipper. In the survey of pro shop buyers, ten saw the Victory and 16 viewed the Clipper. Six identified the Victory and 15 recognized the Clipper as Gear or Gear for Sports products. Finally, of the 19 corporate buyers who saw the Victory, 14 identified the jacket as a Gear or Gear for Sports garment. Of the 20 observing the Clipper, 16 gave similar responses. Based on these figures, Dr. Block gave his opinion that secondary meaning existed in each of these markets.

The flaws in Dr. Block's professional buyer surveys are so substantial and pervasive that they render the survey evidence inadmissible on the question of secondary meaning. The most substantial flaws bearing secondary meaning are that the surveys are underinclusive, select what buyers participated using a biased method, and do not present the overall look of the jackets.

Winning Ways sent Dr. Block a list of buyers with whom plaintiff did business. Dr. Block drew every buyer surveyed from this list. Dr. Block did not survey a single buyer that purchased exclusively from Holloway or that purchased from neither party. As a result, the survey pool was underinclusive. Furthermore, this method of selection biases the professional buyer surveys in favor of Winning Ways because it guarantees that every person surveyed has been exposed previously to the Gear for Sports trademark. Therefore, the results of the these surveys may reflect the familiarity of the buyers with the Gear for Sports trademark rather than the association of the overall look of the Victory and Clipper with plaintiff. Not only did Dr. Block not control for this noise, he created it by his selection method. Finally, the surveys did not present the overall look of the Victory and Clipper. The models wore the jackets zipped up and the picture only shows the front, outside of the coat.

Numerous features that plaintiff contends contribute to the overall look of each jacket are on the inside or on the back of the jacket. None of these can be seen in the photos. Consequently, Dr. Block surveyed professional buyers on trade dress that differs from that at issue in this case. This alone would suffice to render the surveys inadmissible. Combined, the flaws in the professional buyer surveys compel the conclusion that these surveys collected data on the wrong trade dress in an untrustworthy manner. The professional buyer survey evidence is, therefore, excluded for purposes of determining secondary meaning and defendants' objection is sustained to that extent.

### 2. *Amount and manner of advertising*

 The amount, scope, nature and duration of advertising aid a court's determination of whether or not trade dress has achieved secondary meaning. Given the Tenth Circuit's definition of secondary meaning in *Vornado,* however, this court concludes that "[t]he critical question in considering the evidence is not the extent of the promotional efforts but their effectiveness in creating an association" between the trade dress and plaintiff. *Brooks Shoe Mfg. Co.,* 533 F.Supp. at 78. Consistent with this approach, at least one court has held that "[s]econdary meaning cannot be established by advertising that merely pictures the product and does nothing to emphasize the mark or dress," *Ohio Art Co. v. Lewis Galoob Toys, Inc.,* 799 F.Supp. 870, 883 (N.D.Ill.1992), because such advertising does not create the necessary association. Without having to take such a categorical position, the court readily concludes that Winning Ways's advertising does not achieve the critical association.

At the consumer level, Winning Ways does no television or magazine advertising. A few consumers are exposed to the Clipper and Victory jackets through Winning Ways sponsorship of events like the Big 8 basketball tournament, at which Winning Ways gives away jackets. Additional consumers are reached through cooperative advertising in which the advertising of a Winning Ways client, such as a college bookstore, includes pictures of people in Gear for Sports jackets. Plaintiff also provides point of sale signs to retailers but no evidence was presented at trial concerning how many, if any, retailers use these signs. The record is devoid of evidence suggesting that this minimal level of advertising has created an association in the minds of consumers between the trade dress at issue and Winning Ways.

Winning Ways advertises more extensively to professional buyers. Plaintiff attends and/or displays its products at trade shows, advertises in trade publications and distributes catalogs. Winning Ways also issues Gear for Sports Reports, a newsletter, in which plaintiff's trademark and products are advertised indirectly.

Although much of this advertising is directed towards emphasizing Winning Ways's registered trademark Gear for Sports, the Clipper and Victory jackets are featured, particularly in catalogs. Ms. Stevens, who directs Winning Ways's advertising, testified that the print associated with the Victory and Clipper catalog pictures emphasizes the utilitarian advantages of the product. The court's review of the catalogs confirms this as to the Victory. The description of the Clipper calls more attention to the stylish details of the jacket but does not attempt to associate the overall look of the jacket with plaintiff or its trademark. Furthermore, the pictures of the Victory and Clipper in a number of Winning Ways's catalogs from the early 1990s are basic artist sketches. Even in the catalogs that contain a photograph of the Victory and Clipper, one cannot see all of the features that plaintiff claims combine to create each jacket's overall look. Finally, Winning Ways does no "look for" advertising to professional buyers such as "look for the distinctive silhouette unique to Gear for Sports jackets." Under these circumstances, the court concludes that Winning Ways's advertising has not associated the overall look of either the Clipper or Victory with a source of origin.

### 3. *Unsolicited media coverage*

The Victory has received no unsolicited media coverage. Golf and Golf Digest magazines did use the Clipper jacket in some photo layouts. Plaintiff did not introduce any evidence, however, of how often photographs of the Clipper appeared, how the

Clipper came to be chosen, or how the Clipper was displayed in the photos. The court therefore cannot conclude that the use of the Clipper reflects the public's association of the Clipper's overall look with plaintiff or that the photographs created such an association. This factor, therefore, does not support finding secondary meaning.

4. *Exclusivity, length and manner of use*

■ Winning Ways has generally fought attempts by other companies to sell jackets identical to the Victory and Clipper. Through legal action and negotiation, Winning Ways has kept nearly exclusive control over the particular combination of features comprising those two jackets. As noted throughout this order, however, several companies sell very similar jackets, which have the same general overall look. As a result, while Winning Ways's near exclusive control over the particular features of its jackets is some evidence of secondary meaning, it is not strong evidence.

No fixed length of time must pass before trade dress can achieve secondary meaning. J. Thomas McCarthy, *supra*, § 15.20[2]. Winning Ways has sold the Victory since the fall of 1990 and the Clipper since the spring of 1991. This suit was filed December 5, 1994. The approximately four year period between the introduction of these jackets and the filing of this suit has some significance. Because plaintiff has not advertised its jackets in any significant amount or manner, however, a longer period is necessary to achieve secondary meaning. Further, the trade dress that Winning Ways seeks to protect is the jackets themselves, not, for example, the names of the jackets. By word of mouth, a name can achieve secondary meaning. The overall look of each jacket must be viewed before secondary meaning can attach. Plaintiff has not persuaded the court that, given the dearth of advertising and unsolicited media coverage as well as the numerous similar jackets in the marketplace, approximately four years suffices to create secondary meaning in the overall look of either jacket. At best, this evidence has minimal weight.

5. *Amount of sales and number of customers*

■ Winning Ways has made substantial sales of the Victory and Clipper jackets since their introduction. Nearly 600,000 Victory and nearly 900,000 Clipper jackets have been sold since their introduction. In the professional buyer markets at issue, Winning Ways's sales have approximated the following:

| | | Resort | Corporate | Bookstore |
|------|---------|-------------|-------------|--------------|
| 1992 | Clipper | $4,273,000 | $3,465,000 | $ 857,000 |
| | Victory | $1,006,000 | $ 877,000 | $2,539,000 |
| 1993 | Clipper | $4,811,000 | $4,625,000 | $ 627,000 |
| | Victory | $1,265,000 | $1,321,000 | $2,714,000 |
| 1994 | Clipper | $5,185,000 | $4,560,000 | $ 468,000 |
| | Victory | $1,452,000 | $1,716,000 | $2,695,000. |

Winning Ways has provided an incomplete context in which to evaluate the market penetration these sales represent. The evidence shows that plaintiff sells to approximately 1800 of the 3200 college bookstores in the United States. Only 60 percent of these customers, however, have purchased the Victory. Fewer than that carry the Clipper. The record contains no evidence of the number of Winning Ways's customers in the resort market or that market's size. Winning Ways has approximately 1200 corporate customers in a market that, in the words of Mr. Kowalewski, contains every business in America from Intel to the local "Mom and Pop Pizza Shop". Holloway elicited testimony that the corporate market for jackets and caps has been estimated at $7–10 billion.

Other evidence in the record sends somewhat contradictory signals about how to evaluate the market penetration of the Clipper

and Victory. Although these jackets are popular, similar jackets are competing "extremely well." Plaintiff has introduced no evidence of its position vis-a-vis other sellers in the relevant professional buyer markets.

Under these circumstances, the court concludes that while the raw sales figures are evidence of secondary meaning in the relevant professional buyer markets, the weight of this evidence must be discounted by plaintiff's failure to provide the court with a basis to evaluate fully the market penetration that these sales represent. Moreover, sales figures are subject to numerous interpretations and the contention that they are tied to product source identification is not persuasive here.

### 6. *Proof of intentional copying*

■■■ Holloway's Competitor and Challenger jackets are stitch-for-stitch copies of Winning Ways's Victory and Clipper jackets respectively. That fact is plaintiff's most compelling argument in this case. Holloway copied these jackets in response to statements from its sales representatives in various markets that they needed jackets similar to the styles embodied in the Clipper, Victory, Munsingwear, Wall Street Journal and Orvis brand jackets. Regardless of brand name, the sales representatives were referring to jacket styles of which the Clipper and Victory are representative. Holloway was aware that those two jacket styles were popular. To take advantage of the popularity of those jacket styles, Holloway copied the Clipper and Victory. If the purpose of the Lanham Act were to protect creative designers by preventing all intentional copying, then plaintiff would prevail. That, however, is not the act's purpose, *see Vornado*, 58 F.3d at 1508–09, and, under well established trade dress law, the plaintiff is not entitled to the relief it seeks based on the totality of the evidence presented.

As shown by the requests of Holloway's sales representatives, other companies sell jackets similar but not identical to the Clipper and Victory. These similar jackets are able to compete. As a result, the product configurations of the Clipper and Victory are not functional in a legal sense. *See Vornado*, 58 F.3d at 1507 ("If competitors need to be

able to use a particular configuration in order to make an equally competitive product, it is functional, but if they do not, it may not be functional."). Thus, the court must look to other explanations for the copying.

Some courts have held that "[p]roof of copying may be sufficient in and of itself to establish secondary meaning because there is no reason to copy a non-functional feature except to capitalize on an already existing secondary meaning." *E.g., Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 82 (3d Cir.1982). The Tenth Circuit in *Vornado* recognized that such a statement may not be transposed into product configuration cases without careful consideration. "[A]lthough a product configuration must be nonfunctional in order to be protected as trade dress under section 43(a), not every nonfunctional configuration is eligible for that protection." *Vornado*, 58 F.3d at 1500. Implicit in this holding is that some nonfunctional product configurations may be freely copied. Thus, this court believes that the Tenth Circuit would not adopt an *ipso facto* test, *i.e.* copying of a non-functional feature equates to almost conclusive evidence of secondary meaning in a product configuration case. Instead, the Tenth Circuit is likely to look to the trier of fact to determine whether or not that conclusion is warranted under the particular circumstances presented by each case.

■■■ The court finds as a factual determination that Holloway copied the Clipper and Victory to take advantage of those jackets' popular styles and not their source identification. "Product popularity is not the same thing as secondary meaning." J. Thomas McCarthy, *supra*, § 32.54[2][a]. Holloway did not intend to "cash in" on Winning Ways's reputation or goodwill. Citing numerous brand names, Holloway's sales representatives asked for jackets styled like the Victory and Clipper. Holloway responded by pursuing the easiest course, copying those styles using the Clipper and Victory as models. As noted above, trade dress law protects only goodwill toward a seller, not goodwill toward a product. *Thomas & Betts Corp.*, 65 F.3d at 657. Simply put, the circumstances of Holloway's intentional copying

do not support a finding of secondary meaning.

### 7. *Synthesis*

The court finds that plaintiff has not proven the existence of secondary meaning at either the professional buyer or the consumer levels in any market. At the professional buyer level, various flaws preclude the admission of Dr. Block's survey evidence. At the consumer level, the college bookstore consumer survey evidence is similarly excluded. Even if the court admitted the college bookstore consumer survey and evaluated its flaws for the weight to be attached to it as evidence of secondary meaning in the college bookstore/sporting goods consumer market, the consumer surveys do not establish secondary meaning in any consumer market. Although Winning Ways has done some limited advertising, this advertising has not associated the overall look of the Victory and Clipper with plaintiff. Nor has media coverage, solicited through advertising or unsolicited, created such an association. Winning Ways's near exclusive use of the particular combination of features for four years is some evidence of secondary meaning but the court discounts this evidence because numerous other companies sell jackets with very similar overall looks and because plaintiff's advertising has been exceedingly limited. Similarly, although the sales of the Victory and Clipper suggest some secondary meaning may exist, the weight of this evidence is lessened by Winning Ways's· failure to provide a context in which to evaluate these sales. Finally, Holloway copied Winning Ways's jackets so that Holloway could sell a popular jacket style, not to cash in on Holloway's good will. After weighing the evidence, the court concludes that plaintiff has not established that the primary significance of the overall look of the jackets in the minds of professional buyers or consumers is as an indicator of the jackets' source or brand.

### E. *Likelihood of Confusion*

Regardless of any other evidence, the overall look of Winning Ways's jackets cannot be protected as trade dress unless Holloway's jackets cause a likelihood of confusion such that potential customers are likely to think that Holloway is affiliated, connected or associated with Winning Ways or that Holloway's goods originated with, or are sponsored or approved by Winning Ways. *Vornado,* 58 F.3d at 1503. The court's determination of likelihood of confusion is guided by the following interrelated factors:

(a) the degree of similarity between the designation and the trade-mark or trade name in

(i) appearance;

(ii) pronunciation of the words used;

(iii) verbal translation of the pictures or designs involved;

(iv) suggestion;

(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;

(d) the degree of care likely to be exercised by purchasers.

*Beer Nuts, Inc. v. Clover Club Foods Co. (Beer Nuts II),* 805 F.2d 920, 925 (10th Cir. 1986). These factors are clearly tailored for examination of trademarks. Nevertheless with only minor modification, they provide guidance for evaluating the likelihood of confusion in product configuration trade dress cases as well.

### 1. *Similarity of Appearance and Intent*

As noted above, although Holloway's Competitor and Challenger jackets are stitch-for-stitch copies of Winning Ways's Victory and Clipper jackets, the court concludes that Holloway's intention when copying those jackets was not to cash in on Winning Ways's good will but rather to produce and sell jackets of popular styles. The court finds Holloway's lack of "evil" intent less significant when determining likelihood of confusion than when determining secondary meaning. Intentional copying suggests the existence of secondary meaning when the circumstances present no other justification for the copying except to take advantage of the good will of the first user of the trade

dress. *See Ideal Toy Corp.*, 685 F.2d at 82. The intent of the copying party is relevant to this inquiry in order to determine whether another valid motivation for copying the trade dress exists. Likelihood of confusion, however, is examined from the perspective of the purchaser. *See Vornado*, 58 F.3d at 1503. The purchaser is unlikely to know the copying party's intent. In this case there is no evidence that consumers or professional buyers knew why Holloway chose to copy the Clipper and Victory. As a result, Holloway's stitch-for-stitch copying of the Victory and Clipper is generally significant evidence of likelihood of confusion.

■ Having said that, the weight of this evidence must be reduced in the resort consumer market. Plaintiff has introduced no evidence that any resort sells both the Holloway and Winning Ways versions of the jackets at issue. Nor has plaintiff established that resorts compete with other retailers for the same consumer. Ninety-five percent of the jackets that Winning Ways sells to resorts are imprinted. To the extent that a consumer purchases a jacket because of the logo on it, the resort is likely the only retailer of that jacket.[11] Thus, the resort consumer market differs from the college bookstore/sporting goods consumer market. In the latter market, consumers can buy collegiate logoed jackets at multiple outlets. The inability to purchase resort logoed apparel at multiple, competing locations reduces the likelihood of confusion in the resort consumer market.

### 2. *Marketing*

■ Neither party markets directly to the consumer in the relevant markets. At the professional buyer level, Winning Ways markets its products through either catalogs or independent sales representatives. Holloway also issues catalogs and uses sales representatives. These similarities do not, however, indicate a likelihood of confusion by professional buyers. The parties' catalogs prominently display the source of the products appearing in the catalogs. Further, aside from the Competitor and Challenger jackets, the products shown in Holloway's catalog do not mirror the products shown in Winning Ways's catalog. The court is not persuaded that the inclusion of the Competitor and Challenger jackets in otherwise diverse Holloway catalogs causes any likelihood that professional buyers will think that Holloway is affiliated, connected or associated with Winning Ways or that the Competitor or Challenger originated with, or are sponsored or approved by Winning Ways.

Similarly, although both parties use sales representatives, they do not use the same representatives. The evidence in the record indicates that professional buyers know what company each sales representative represents and the source of that sales representative's products. As a result, Holloway's use of sales representatives that do not also sell Winning Ways's products is strong evidence that professional buyers are not likely to be confused.

At the consumer level, college bookstores and sporting goods stores compete for the same consumer. Although Winning Ways provides point of purchase displays to retailers, there is no evidence of the extent that retailers use them. Furthermore, not all retailers order plaintiff's jackets on Winning Ways hangers or with Winning Ways hang tags. Consequently, the jackets are often displayed to consumers without any identifying marks other than the label, at which not all consumers look. Thus, the court finds that the marketing methods used—or not used—by stores competing for the same consumer is evidence of likelihood of confusion in the college bookstore/sporting goods store market. Again, however, in the resort market, there is no evidence that Holloway and Winning Ways sell to the same resorts or that the resorts compete with other outlets for the same consumer. Thus, marketing methods do not suggest a likelihood of confusion in the resort consumer market.

### 3. *Degree of Care Exercised by Purchasers*

■ The court finds that professional buyers exercise a high degree of care when purchasing products. These purchasers are professionals, which by itself bespeaks a high level of care and sophistication. Further-

---

**11.** Certainly, plaintiff introduced no evidence to show otherwise.

more, unlike consumers, professional buyers purchase in quantity. For example, the minimum order from Winning Ways absent special circumstances is 36 units. Such an order requires a significant expenditure, which compels careful consideration. Careful consideration reduces the chances that professional buyers are likely to be confused.

The sophistication of consumers differs by market. College bookstore consumers are highly sophisticated relative to the average retail consumer. Resort consumers are highly sophisticated at destination and golf resorts but less so at theme parks and national parks. As a result, the sophistication of consumers at bookstores and high end resorts makes confusion less likely. Conversely, the lack of sophistication of other resort consumers increases the likelihood of confusion were those consumers called upon to make product source related choices.

### 4. *Surveys*

■ In addition to evidence going to the *Beer Nuts II* factors, plaintiff also relies on Dr. Block's surveys, which were commissioned not only to measure secondary meaning, but also to gauge likelihood of confusion. After examining the surveys' methodology and summary tabulations, however, the court concludes that the survey evidence is inadmissible for the purpose of determining likelihood of confusion in any market, at any level.

According to the consumer surveys, 48 percent of college bookstore consumers who viewed the Victory and Competitor said that the two jackets were put out by the same or related companies. Fifty percent of pro shop consumers had the same reaction. As for the Clipper, 58 percent of college bookstore consumers and 55 percent of pro shop customers reached the same conclusion. From these numbers, Dr. Block opined that a likelihood of confusion between the jackets existed in both consumer markets as he defined them.

Flaws in both the surveys' methodology and in Dr. Block's use of the compiled information, prevent the surveys from assisting the court in determining whether a likelihood of confusion exists. At the consumer level, Dr. Block's under inclusive market definition

has already been noted. In addition, the figures about which Dr. Block testified are the measure of gross confusion, not net confusion. That is, Dr. Block testified using numbers that had not been adjusted to account for noise in the market. Dr. Block included the Ivy Club jacket in order to control for noise, yet did not indicate in either his testimony or the written summary tabulation submitted to the court what effect that noise has. The tabulation does reveal, however, the presence of substantial noise in both consumer markets. Thirty-five percent of college bookstore consumers and 24 percent of pro shop consumers stated that the Victory and the Ivy Club jackets were put out by the same or related companies. Fifty-three percent of college bookstore consumers and 33 percent of pro shop consumers reached the same conclusion about the Clipper and the Ivy Club jacket.

From the evidence in the record, the court cannot determine the effect of this noise. No person who saw the Victory and Competitor combination of jackets also saw the Victory and Ivy Club combination. Similarly, no person who saw the Clipper and Challenger combination of jackets saw the Clipper and Ivy Club combination. Furthermore, noise and gross confusion were computed as a percentage of the people who saw a particular combination of jackets. As a result, the court cannot merely subtract the noise from the gross confusion and arrive at net confusion. The court is left with figures that show gross confusion exists and figures that show substantial noise is present.

In the professional buyer surveys, Dr. Block similarly fails to account for noise that his tabulation shows is present in some markets. The professional buyer surveys also suffer from additional flaws. First, as noted above, the photographs fail to illustrate the trade dress at issue. Second, the photographs do not simulate the market in which professional buyers purchase jackets. As discussed more fully below, jackets are primarily purchased either by ordering from catalogs or from sales representatives. The photographs are representative of neither method. As a result, the court finds both the consumer and professional buyer survey evi-

dence inadmissible because it does not make the existence of likelihood of confusion more probable or less probable than it would be without the evidence. Fed.R.Evid. 401.

### 5. *Synthesis*

■ Turning first to the professional buyer markets, the court finds that professional buyers are not likely to be confused. The proffered survey evidence, even if it were admissible, provides no trustworthy information addressing this question. The exact duplication by Holloway of Winning Ways's jackets suggests likelihood of confusion, but this evidence is substantially outweighed by how jackets are marketed to professional buyers and the degree of care professional buyers exercise when making purchasing decisions. Professional buyers know the source of jackets they are purchasing, know that Holloway and Winning Ways are not affiliated with each other, and know that Winning Ways does not sponsor Holloway's products.

■ The court also concludes that resort consumers are not likely to be confused, but for a somewhat different reason. Winning Ways has not established that resorts compete with other outlets for the same consumer. Without such competition, Holloway's copying is not likely to confuse consumers in this market because their choices are not shown to be product source influenced in a market where the opportunity to purchase a garment with the resort's logo is apparently so limited. Without such competition, the sophistication of consumers is not significant.

■ In contrast, the court finds that the evidence suggests a likelihood of confusion for consumers in the college bookstore/sporting goods store market.[12] Holloway caused any such confusion by its stitch-for-stitch copying. Unlike in the professional buyer markets, the marketing of jackets to consumers does not mitigate the confusion. Further, the court concludes that Holloway has not established, at this point, that the sophistication of the consumers overcomes the confusion caused by exact duplication. Under these circumstances, the state of the

evidence is that consumers in this market may be likely to be confused. Thus, if the jackets were inherently distinctive or had acquired secondary meaning, this finding would take on substantial significance. Here, however, where neither has been demonstrated, this conclusion alone does not permit the plaintiff's case to go forward.

### III. *Conclusion*

The overall look of neither the Victory nor Clipper jacket is inherently distinctive. Neither has the overall look of either jacket acquired secondary meaning. As a result, that certain consumers may be likely to be confused by Holloway's duplication does not render the overall look of the Victory or Clipper protectable trade dress and defendants are entitled to a favorable ruling on their motion.

**IT IS THEREFORE BY THE COURT ORDERED** that defendants' motion pursuant to Rule 52(c) (Doc. # 132) is granted. The clerk is directed to enter judgment in favor of defendants Holloway Sportswear, Inc. and Holloway Group, Inc. Costs shall be taxed against Winning Ways, Inc.

**IT IS SO ORDERED.**

---

**12.** Because of the procedural posture of this motion, the court does not make a finding of likelihood of confusion because, of course, defendants have not been fully heard.